| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
|---|---|
| KARLENE A. GORDON,<br><br>                    Plaintiff,<br><br>– against –<br><br>CITY OF NEW YORK, CARMEN S. RUIZ, BERTHA STALLINGS, REBECCA ROBINSON, AND ADMINISTRATION FOR CHILDREN'S SERVICES,<br><br>                    Defendants. | **MEMORANDUM & ORDER**<br><br>1:09-cv-04577 (ERK) (MDG) |

KORMAN, J.:

**BACKGROUND**

Plaintiff Karlene Gordon ("Gordon") brought this lawsuit upon learning in 2008 that a report of child neglect made against her in May of 2000 (the "May 2000 Report" or the "Report") had been "indicated." For a reported incident of neglect to be "indicated" means that "an investigation [has] determine[d] that some credible evidence of the alleged abuse or maltreatment exists." N.Y. Soc. Serv. Law § 412(7). Although it is not entirely clear, the gravamen of Gordon's complaint seems to be her allegation that the May 2000 Report was not substantiated, and that the individual defendants allegedly responsible for investigating it and concluding that it was "indicated"—Bertha Stallings ("Stallings"), Carmen Ruiz ("Ruiz"), and Rebecca Robinson ("Robinson")—knew the Report was not substantiated. Moreover, according to Gordon, two of the individual defendants, Stallings and Ruiz, had told her in July of 2000 that the New York City Administration for Children's Services ("ACS") had found the allegations in the Report to be unsubstantiated—or, in the statutory argot, "unfounded," N.Y. Soc. Serv. Law § 412(6). When she discovered in 2008 that the Report had, in fact, been "indicated," Gordon requested that the Report be amended to unfounded and sealed. The New York State Office of Children and Family

1

Services initially denied her request, but, because ACS did not oppose her request after it was referred to the Bureau of Special Hearings for a hearing, her request was ultimately granted.

In her Amended Complaint, Gordon alleges a malicious prosecution claim under 42 U.S.C. § 1983 against the three individual defendants, as well as the following five state-law causes of action: malicious prosecution against all defendants, intentional infliction of emotional distress against all defendants, negligent hiring against the municipal defendants, negligent retention and supervision against the municipal defendants, and negligent misrepresentation against all defendants. The City now moves for summary judgment on all counts.

**A. Factual Background**

The facts underlying Gordon's lawsuit have a genesis in an acrimonious divorce and accompanying battle with her ex-husband for the custody of their son. It is worth noting at the outset that Gordon appears to rest her malicious prosecution claim on the finding that the May 2000 Report was substantiated, which she contends was false, *see* Am. Compl. ¶¶ 9–12, ECF No. 9, but the City treats her claim as resting on a Family Court proceeding, *see* Mem. Law Supp. Defs.' Mot. Summ. J. 14–15 [hereinafter Defs.' Mem.], ECF No. 97. Thus, the relevant facts can be broken up into two parallel narratives: the Family Court proceeding and the May 2000 Report.

1. The Family Court Proceeding

Before the relevant Family Court proceeding began, Gordon was already embroiled in a contentious matrimonial proceeding with her now ex-husband. Dantowitz Decl. Supp. Defs.' Mot. Summ. J. ¶¶ 2–3 [hereinafter Dantowitz Decl.], ECF No. 96. In 1997, while the matrimonial proceeding was pending, Gordon's ex-husband petitioned for custody of their son. Dantowitz Decl. ¶ 3 & Exs. A, B.[1] During the pendency of both of these proceedings, Gordon filed a report

---

[1] Dantowitz Declaration exhibits A through Y may be located at ECF number 98 attachments one through twenty-five, respectively. Exhibit Z may be located at ECF number 96 attachment one.

alleging that her son's half-siblings had sexually abused him. Dantowitz Decl. ¶ 4 & Ex. C. Following an investigation, ACS concluded, on February 9, 1999, that the allegations were unfounded. Dantowitz Dec. ¶ 5–6 & Ex. D at NYC1203.[2] Indeed, the ACS caseworker assigned to investigate the report noted that Gordon "ha[d] a history of reporting allegations of sex abuse concerning [her son] every time [he] return[ed] from weekend visits [with his father]." Dantowitz Decl. Ex. D at NYC1208. Yet, despite "numerous trips to hospital ER rooms all over New York"—and accompanying physical examinations and, on a least one occasion, a "rape kit"—there was "no physical evidence to substantiate [the] allegations." *Id.*

Before ACS reached that conclusion, however, the Family Court ordered ACS, on January 6, 1999, to investigate Gordon's allegations of abuse, and to "file the appropriate petition if abuse (sexual, physical or emotional abuse) [was] found, or if it [was] found [that] false or untrue allegations of sexual [or] physical abuse were alleged." Dantowitz Decl. Ex. E at NYC831. The next day, ACS removed Gordon's son from her custody. Dantowitz Decl. Ex. F; *see also* Defs.' Local Rule 56.1 Statement of Material Facts Not in Dispute ¶ 3 [hereinafter Defs.' Rule 56.1 Statement], ECF No. 94. And, on January 8, 1998, ACS filed a neglect petition against Gordon. Dantowitz Decl. Ex. G at NYC908–09.

In the neglect petition—which is the petition relevant to this case—Fatuma Mohamed, the ACS caseworker who filed the petition, alleged that Gordon "failed to provide proper supervision and guardianship" because, for about eighteen months, Gordon had "made allegations that the child, [Gordon's son], age five, ha[d] been sexually and physically abused while in this care of his father"; as a result of these allegations, Gordon had "repeatedly subjected the child to invasive medical procedures." *Id.* at NYC908, NYC911. Indeed, Gordon had taken her son "for at least six physical examinations for signs of sexual abuse at six different hospitals," none of which

---

[2] "NYC" or "KG" followed by a number indicates a page number.

yielded "any indication of sexual or physical abuse." *Id.* at NYC911. Thus, by "making false allegations of sexual abuse," Gordon "exposed [her son] to unnecessary, invasive medical examinations and interrogations and as a result ha[d] impaired [her son's] mental or emotional health or condition." *Id.* On January 12, 1999, the Family Court confirmed ACS's removal of Gordon's son from her custody and gave Gordon's ex-husband temporary custody. Dantowitz Decl. ¶ 14 & Ex. H at KG0016.

On February 14, 2001, the Family Court awarded Gordon's ex-husband full custody of their son, "subject to a final order of the Supreme Court in the pending matrimonial case." Dantowitz Decl. Ex. R; *see also* Defs.' Rule 56.1 Statement ¶ 10. On the same day, Gordon accepted an adjournment in contemplation of dismissal, which provided for the dismissal of the neglect petition after one year if she complied with certain conditions.[3] Dantowitz Decl. ¶ 25 & Ex. S; Defs.' Rule 56.1 Statement ¶ 11. Accordingly, the neglect petition was dismissed on February 14, 2002. Defs.' Rule 56.1 Statement ¶ 12.

The Queens County Supreme Court "issued a judgment of divorce" on March 5, 2003, which awarded Gordon's ex-husband custody of their child. Dantowitz Decl. ¶ 27 & Ex. T at NYC68. Because Gordon failed to appear in court, "the judgment was entered by default." Dantowitz Decl. Ex. T at NYC68. On June 26, 2003, the Supreme Court denied Gordon's motion to vacate her default, the judgment of divorce, and the custody determination. *Id.* at NYC68–69. On July 17, 2003, following Gordon's "increasingly egregious violations of [the] court's [visitation] orders"—which included "failing to pick up the child at the agreed-upon location, failing to return the child by 6:00 p.m., . . . visiting the child's school, and finally . . . absconding

---

[3] The conditions were that Gordon "not take the child for medical care without notifying the father or without the father being present, except in an emergency and father cannot be located," and that Gordon "not instruct the child to make false allegations of abuse against the father or others in the household." Dantowitz Decl. Ex. S at NYC153.

with the child for several days"—and considering "the long, troubled history of this case, and the consequent ill effects on the child," the Queens County Supreme Court determined that "visitation between [Gordon] and the child will only be appropriate on a supervised basis," and suspended Gordon's visitation rights. Dantowitz Decl. Ex. U at NYC71–72.

2. The May 2000 Report

The second narrative relevant to the Gordon's claims—which, as previously mentioned, runs parallel to the one summarized above—requires some backtracking. On May 4, 2000, ACS received a report accusing Gordon and her now ex-husband of educational neglect, inadequate guardianship, and sex abuse. Dantowitz Decl. ¶ 15 & Ex. I at NYC450. According to the Report, Gordon, "in an effort to get back at" her now ex-husband, "told [her son] to tell his teacher that his father is touching his penis." *Id.* Ex. I at NYC452. The Report continues, however that "in the last week[']s days, the child has been sexually acting out at school and the source [who made the Report] is very concerned that the child may[ ]be being sexually abused by either his father or mother." *Id.* ACS conducted an investigation, which was initially assigned to caseworker Deborah Johnson, who was supervised by defendant Robinson, and was reassigned to defendant Ruiz, who was supervised by defendant Stallings. Dantowitz Decl. ¶ 16 & Ex. L at NYC1042.

During the investigation, on May 5, 2000, ACS received a letter from Gordon's son's guidance counselor stating that, "[w]hen [he was] questioned about family issues, [he] appears guarded and sometimes irritated. He has admitted that, 'mommy wanted me to tell the teacher that my brothers and sisters were hurting me. But it's not true.'" Dantowitz Decl. Ex. K; *see also* Dantowitz Decl. ¶ 17.

Moreover, on May 8, 2000, and May 22, 2000, a "forensic investigation was conducted." Dantowitz Decl. ¶ 19 & Exs. M, N. Fatuma Mohamed, an ACS caseworker, made the request for the investigation as a result of her "concerns regarding [Gordon's son's] disclosure [of sexual

5

abuse to a schoolteacher] and the possibility that someone in his family may have coached him into making the allegation of sexual abuse." Dantowitz Decl. Ex. M at NYC224. A forensic investigation—or forensic assessment or forensic interview—is a series of interview sessions with an allegedly neglected or abused child in "a comfortable and therapeutic setting" aimed at determining "the veracity of the [neglect] case." *Id.*

On May 26, 2000, the therapist conducting the forensic assessment wrote to the Family Court stating that, "[a]fter meeting with [Gordon's son] on two separate occasions, it became very evident by [her son's] own admission that he was coached by his biological mother, Ms. Karlene Gordon, into making the allegation of sexual abuse against [his step-siblings]." Dantowitz Decl. Ex. N at NYC493. The Family Court was also "advised of the allegations contained in the May 2000 Report," Dantowitz Decl. ¶ 18 & Ex. O at NYC287–89, as well as "the allegations that [Gordon] was coaching [her son]," Dantowitz Decl. ¶ 20 & Ex. P at NYC301, NYC310, NYC333–34. There were three additional sessions as part of the forensic assessment—on June 12, 2000, June 26, 2000, and July 24, 2000—although the therapist's conclusion that Gordon had been coaching her son to make false allegations of sexual abuse did not change. Dantowitz Decl. Ex. M at NYC226–29. The investigation into the allegations made in May 2000 Report also included, among other things, a visit to Gordon's and Gordon's ex-husband's respective homes. Dantowitz Decl. Ex. L at NYC1044–45; *see generally* Dantowitz Decl. Ex. L.

ACS concluded its investigation on July 5, 2000, and found that the Report was unsubstantiated except as to the allegation of inadequate guardianship against Gordon, for which the allegation was substantiated. Dantowitz Decl. ¶ 21 & Ex. L at NYC1050; *see* Dantowitz Decl. Ex. Q. The basis for this substantiated finding was that, "[f]rom several different sources, there [was] evidence that [Gordon] coached [her son] to make untrue allegations." Dantowitz Decl. Ex. L at NYC1050. Thus, ACS concluded that the Report was "indicated." Dantowitz Decl. Ex. Q.

The Family Court was not made aware of this finding while the neglect proceeding against Gordon was pending, nor did ACS take any further action based upon it. Defs.' Rule 56.1 Statement ¶¶ 7–8; Dantowitz Decl. ¶¶ 22–23.

According to the allegations in Gordon's Complaint, Stallings and Ruiz told her in July 2000 that ACS had found the Report to be unsubstantiated. Am. Compl. ¶ 10. During a Family Court hearing on February 29, 2008, Gordon discovered that that was untrue, and that she had been "'indicated' in a report filed with the Office of Children and Family Services Child Protection Services." Dantowitz Decl. Ex. V at KG006. On March 25, 2008, Gordon requested administrative review of the "indicated" finding. *Id.* at KG006, KG008. On June 5, 2008, the New York State Office of Children and Family Services completed an administrative review, and denied Gordon's "request to legally seal or expunge the report." Dantowitz Decl. Ex. X at KG0021. Gordon's request was then referred to the Office of Children and Family Services Bureau of Special Hearings for a hearing. Dantowitz Decl. Ex. Y at KG0026. ACS, however, "advised the Bureau that it would not oppose" Gordon's request to have the Report "amended to unfounded and sealed by the New York State Central Register." *Id.* Thus, the Bureau granted Gordon's request. *Id.*

This decision was a apparently practical one, if only because, by the time Gordon requested a hearing, her "son was 15 years old, the Family Court proceedings had been terminated years earlier with Plaintiff's acceptance of an [adjournment in contemplation of dismissal], the child's father had been awarded final custody[,] and the mother and child had received counseling services"; thus, from ACS's perspective, "there was simply nothing to be gained by ACS proceeding with" a hearing. Reinstein Decl. Supp. Mot. Summ. J. ¶¶ 23–24, ECF No. 95.

**B. Procedural Background**

The procedural background of this case is fairly lengthy. I summarize it here to give the present motion context.

Gordon filed a pro se notice of claim with the City of New York on October 14, 2008, alleging malicious prosecution and negligent misrepresentation. Dantowitz Decl. Ex. Z at KG0028. She filed her federal Complaint in this district on October 23, 2009, ECF No. 1, and her Amended Complaint on April 2, 2010, ECF No. 9. After several extensions, the parties completed discovery on December 23, 2010. *See* Unnumbered Min. Entry dated Dec. 23, 2010.

Although Magistrate Judge Go had set a summary judgment briefing schedule at that time, no motion was filed because the parties jointly requested that that the briefing schedule be extended. Consent Mot. for Extension of Time to File Summ. J. Mot., ECF No. 13. It appeared that the parties were approaching a settlement. *See* Joint Mot. for Extension of Time to File Summ. J. Mot. & Requesting Settlement Conference, ECF No. 14. Indeed, on June 14, 2011, the City wrote to Magistrate Judge Go stating that the parties had reached a settlement. Letter Regarding Settlement, ECF No. 16. Nevertheless, after several updates and a conference, Gordon's attorney wrote on September 23, 2011, to inform the Court that Gordon refused to sign the settlement documents. Letter Reporting Status, ECF No. 20.

On December 6, 2011, the City moved to enforce the settlement. *See* Notice of Mot. Settlement Enforcement, ECF No. 24. Just over a week later, Gordon fired her attorney, s*ee* Letter Advising of Pl.'s Termination of Her Attorney's Servs., ECF No. 29, and, on December 20, 2011, she objected to the City's motion for settlement enforcement, Obj. Mot. Enforce Settlement, ECF No. 31. After almost three years of extensions of time for, among other things, Gordon to retain a new attorney and obtain her file from the attorney she discharged, Magistrate Judge Go issued a

Report and Recommendation on September 8, 2014, recommending that I deny the City's motion to enforce the settlement. R. & R., ECF No. 59. The City objected. Obj. to R. & R., ECF No. 62.

In a Memorandum and Order dated March 31, 2015, I adopted in part and rejected in part Magistrate Judge Go's Report and Recommendation and granted the City's motion to enforce the settlement. Order Granting Mot. Settlement Enforcement, ECF No. 68. I found that Gordon's attorney "had actual authority to enter into the October 28 settlement agreement, . . . as memorialized in the stipulation of settlement," and thus, it was "binding on" Gordon. *Id.* at 14. Nevertheless, I immediately stayed the order enforcing the settlement because of an outstanding issue regarding the allocation of the settlement funds. Unnumbered Order dated Apr. 3, 2015. Troubled by the fact that Gordon would receive "no direct payment" because of a child arrears lien—a consequence of which there was "no indication in the record that plaintiff was aware"—I ordered the City and Gordon's former attorney "to address whether I should vacate the Order approving the settlement." Unnumbered Order dated Apr. 10, 2015. In its response, the City argued that, based on Gordon's statements during in-court settlement discussions as well her response to the City's motion for settlement enforcement, Gordon was aware that any settlement proceeds would be used to partially satisfy her child support arrears. Letter Addressing Issue Raised in Ct.'s Order of Apr. 10, 2015, at 2–4, ECF No. 71.

Gordon advised me that she was appealing the child support and arrears order that was the basis for the above-mentioned lien in state court and requested a stay of my order enforcing the settlement pending the resolution of her appeal. Mot. Stay the Order of 4/3/15, ECF No. 73. She subsequently requested that I vacate the enforcement order. Letter Requesting Ct. Vacate 4/3/15 Order, ECF No. 76. I held a hearing on Gordon's motion to stay the settlement enforcement order, during which I granted her request for time to try to retain new counsel. Min. Entry, May 15, 2015, ECF No. 77. I ultimately granted Gordon's stay motion. Unnumbered Order dated Apr. 1,

2016.  The City has since advised me via letter that Gordon's state court appeal was dismissed.  Letter Advising Ct. that Pl.'s State Ct. Appeal was Dismissed, ECF No. 100.

A pretrial conference was scheduled for October 14, 2015.  Unnumbered Entry dated Sept. 29, 2015.  At the conference, I granted Gordon's request for additional time to find an attorney.  Min. Entry, Oct. 14, 2015, ECF No. 83.  At a final pretrial conference on December 16, 2015, I again granted Gordon additional time to try to find an attorney.  Min. Order, Dec. 16, 2015, ECF No. 87.  In January 2016, I issued an order stating that I would appoint pro bono counsel to represent Gordon in her opposition to the summary judgment motion the City indicated it planned to file, if such an attorney could be found.  Unnumbered Order dated Jan. 8, 2016; Order, Feb. 8, 2016, ECF No. 91.

On April 4, 2016, the City filed the present motion for summary judgment.  *See* Notice of Mot. Summ. J. with Annexed Notice to Pro Se Litigant Who Opposes Mot. Summ. J., ECF No. 93.  With its Notice of Motion, the City provided Gordon with a notice informing her of the nature of its motion and the consequences of her failure to respond to it.  *Id.*  On May 3, 2016, I also wrote to Gordon advising her of the nature and consequences of the City's motion.  Letter from Judge Korman to Karlene Gordon Regarding the City's Summ. J. Mot., ECF No. 101.  On the same day, the Pro Se Staff Attorney wrote that, although the Pro Se Office had solicited for an attorney to represent Gordon since February, "to date, no attorneys have expressed interest in the representation."  Letter dated May 3, 2016 from Pro Se Law Clerk to Case Man[a]ger, ECF No. 102.  Moreover, although I had stated that I would appoint pro bono counsel, as I had previously stated, I "cannot require an attorney to take a pro bono case, but can only request an attorney to volunteer."  Order, Feb. 2, 2016, ECF No. 91.  Gordon, unable to obtain counsel—pro bono or

10

otherwise—has made no effort to oppose the motion.[4] The City has requested that I either rule on its fully briefed summary judgment motion or lift the stay of my March 31, 2015, order enforcing the settlement. Letter Requesting Ct. Either Lift Stay or Decide Mot., ECF No. 103.

## ANALYSIS

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citation omitted). Nevertheless, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 250–51.

"Proceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (quoting *Carbonell v. Goord*, No. 99 Civ. 3208 (AJP), 2000 WL 760751, at *5

---

[4] I add the following caveat. In a letter to me docketed on May 25, 2016, Gordon wrote that she is "aware that the Defendants acknowledge their faults and accept the liability for their malicious prosecution of this mother. Therefore the only matters remaining are the damages, losses and injuries inflicted upon Karlene Gordon and her children, and the results thereof." Letter Undated to Judge Korman from Pro Se Pl. Karlene Gordon Requesting Ct. Continue Stay 1, ECF No. 104. While this letter opens and closes with the same request—additional time to calculate her damages—the intervening pages contain numerous allegations. *Id.* at 3–6. Some of these allegations are entirely conclusory, but to the extent that they are factual and appear to be based on Gordon's personal knowledge, the letter could arguably be construed as a declaration in opposition to the City's summary judgment motion. Critically, however, her allegations do not mention any of the named plaintiffs; instead, they mention Fatuma Mohamed, who is not a defendant in this case. *Id.* at 3–5.

(S.D.N.Y. June 13, 2000)). Moreover, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).

## B. Merits

Gordon alleges only one federal cause of action—malicious prosecution under 42 U.S.C. § 1983 against the three named defendants, Ruiz, Stallings, and Robinson. She also alleges five state-law causes of action: malicious prosecution, intentional infliction of emotional distress, negligent hiring, negligent retention and supervision, and negligent misrepresentation. I limit my discussion here to the single federal claim.

Gordon alleges that the individual defendants investigated, or were involved in investigating, a report alleging that she had neglected her son, and maliciously concluded that it was substantiated although they knew it was not. Am. Compl. ¶¶ 9–12. Indeed, she alleges that "[a]t no time did [she] commit any offenses against the law of New York City and/or State for which such prosecution should be carried out against her. And at no time did [she] commit any illegal acts, or engage in any conduct which in any way justified the unlawful actions of the Defendants." *Id.* ¶ 16. The City argues, in short, that Gordon "cannot satisfy the elements of her claim." Defs.' Mem. 13.

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his [or her] rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law." *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (citations omitted). To establish a malicious prosecution claim under New York law, a plaintiff is "required to show the following: '(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the

12

proceeding was begun with malice[,] and[ ] (4) the matter terminated in plaintiff's favor.'" *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations in original) (quoting *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010)). Moreover, when a malicious prosecution claim is premised on a civil proceeding, a plaintiff must show a "special injury"—"some concrete harm that is considerably more cumbersome than the physical, psychological or financial demands of defending a lawsuit." *Engel v. CBS, Inc.*, 93 N.Y.2d 195, 198, 205 (1999).

I first address whether Gordon has produced evidence of a violation of her federal constitutional rights that would support a malicious prosecution action under § 1983. I then discuss why her failure to demonstrate that any of the individual defendants caused the alleged constitutional deprivation is fatal to her claim.

1. Fourth Amendment Violation

The City argues that, because Gordon was never "seized" within the meaning of the Fourth Amendment in connection with the Family Court proceedings, her malicious prosecution claim under § 1983 fails. Defs.' Mem. 19–20. Indeed, "to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his [or her] rights under the Fourth Amendment." *Roberts v. Babkiewicz*, 582 F.3d 418, 420 (2d Cir. 2009) (per curiam) (quoting *Fulton*, 289 F.3d at 195).

Thus, as Judge Weinstein has observed, "[t]he federal cause of action for malicious prosecution is more limited in scope than the equivalent claim under New York law. While New York recognizes the tort of civil malicious prosecution, a claim for malicious prosecution under § 1983 may only arise where there has been a violation of the plaintiff's Fourth Amendment rights." *Graham v. City of New York*, 869 F. Supp. 2d 337, 356 (E.D.N.Y. 2012) (citing *Washington v. Cty. of Rockland*, 373 F.3d 310, 315–16 (2d Cir. 2004) (Sotomayor, J.)). And, as Judge Cogan put it, while "[m]alicious prosecution claims are generally limited to criminal actions,

13

. . . a § 1983 malicious prosecution claim in a civil proceeding can be sustained if there is 'a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Cornejo v. Bell*, Nos. CV–04–0341 (BMC)(SMG), CV–06–2910 (BMC)(SMG), 2008 WL 5743934, at *12 (E.D.N.Y. May 19, 2008) (quoting *Washington*, 373 F.3d at 316), *aff'd*, 592 F.3d 121 (2d Cir. 2010).

Here, Gordon has not alleged any such violation. While "the removal of [Gordon's] son is sufficient to meet that [Fourth Amendment] threshold," *Cornejo*, 2008 WL 5743934, at *12 (citing *Providencia V. v. Schutlze*, No. 02 Civ. 9616 (LTS)(HBP), 2007 WL 1582996, at *5 n.3 (S.D.N.Y. May 31, 2007)), "[o]nly her child[]'s Fourth Amendment rights were implicated when [he was] seized from her custody," *Kaminski v. Comm'r of Oneida Cty. Dep't of Soc. Servs.*, 804 F Supp. 2d 100, 106 (N.D.N.Y. 2011). Indeed, "[a] Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf." *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012) (citing *Tenenbaum v. Williams*, 193 F.3d 581, 601 n.13 (2d Cir. 1999)); *see also Graham*, 869 F. Supp. 2d at 355 ("While a Fourth Amendment claim may be brought by a parent on behalf of a child, parents do not have their own Fourth Amendment right to be free from a child's court-approved removal."). Here, unlike in *Cornejo*, 2008 WL 5743934, and *Providencia V.*, 2007 WL 1582996, Gordon does not assert any claims on behalf of her son. Thus, while denying Gordon custody "may have infringed on [her] liberty interest in maintaining the integrity of [her] family, this is not the liberty of movement— physical freedom—that the Fourth Amendment protects." *Graham*, 869 F. Supp. 2d at 355.

Indeed, Gordon appears to rely on substantive due process. Specifically, she alleges that, "[b]y prosecuting [her], maliciously, the Defendants deprived [her] of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, . . . including, but not limited to, rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution."

Am. Compl. ¶ 24. While she does not spell out what "rights guaranteed by the Fifth and Fourteenth Amendments" she thinks were implicated by the defendants' actions, she does allege that, "[a]s a direct and proximate result of Defendants' actions, custody of [her] son and/or visitation with her son has continued to be denied." Am. Compl. ¶ 15. Thus, she appears to claim a violation of her "constitutionally protected liberty interest in the care, custody and management of [her] child[]." *Tenenbaum*, 193 F.3d at 593 (collecting cases). That interest, however, is premised "on a substantive due process theory." *Southerland*, 680 F.3d at 152 (citing *Tenenbaum*, 193 F.3d at 600). But "a claim of malicious prosecution may not be brought as a substantive due process claim." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995). Nevertheless, as explained below, even if I construe Gordon's claim as one sounding in substantive due process rather than as a claim for malicious prosecution, it does not clear the summary judgment hurdle.

2. Causation and Personal Involvement in Gordon's Prosecution

The City argues that Gordon cannot demonstrate that any of the individual defendants were personally involved in a violation of her constitutional rights, and thus, Gordon cannot state a claim under § 1983. Defs.' Mem. 22–23. To state a claim under § 1983, a plaintiff "must allege that the challenged conduct was attributable to a person acting under color of state law, and that such conduct deprived him [or her] of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Charles W. v. Maul*, 214 F.3d 350, 357 (2d Cir. 2000). Indeed, "the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). Thus, a plaintiff must demonstrate that the defendants' actions were the proximate cause of the alleged constitutional violation. *See Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002).

Assuming that Gordon has shown a deprivation of a constitutional right—the "constitutionally protected liberty interest in the care, custody and management of [her] child[]," *see Tenenbaum*, 193 F.3d at 593—she has failed to demonstrate that that deprivation was the result of the individual defendants' conduct. As explained more fully above, "there is no evidence that the Family Court was ever made aware of the findings [of the May 2000 Report] during the pendency of the neglect proceeding, as none of the individual Defendants testified at the Family Court proceeding and there was no testimony or colloquy concerning the results of the May 2000 Report." Dantowitz Decl. ¶ 23. Yet, as mentioned, the Family Court proceeding is the proceeding that deprived Gordon of custody of her son and awarded custody to Gordon's ex-husband. Dantowitz Decl. Ex. R. Moreover, the Queens County Supreme Court suspended Gordon's visitation rights because of her violations of that court's orders, not the May 2000 Report. Dantowitz Decl. Ex. U at NYC71–72. Thus, regardless of whether Gordon's claim is properly styled as a malicious prosecution claim or should have instead been styled as a due process claim, there is no causal link between the individual defendants' alleged wrongdoing—indicating that the May 2000 Report was substantiated when they knew it was not, *see* Am. Compl. ¶ 12—and Gordon's loss of custody and visitation.

## CONCLUSION

I grant the City's motion for summary judgment as to Gordon's § 1983 malicious prosecution claim. I decline to exercise supplemental jurisdiction over her remaining state-law claims and dismiss them without prejudice. *See* 28 U.S.C. § 1367(c)(3); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 304–06 (2d Cir. 2003).

**SO ORDERED.**

Brooklyn, New York
July 22, 2016

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge